IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | CRIMINAL ACTION NO. 05-619-2 |
| v. | : | |
| | : | CIVIL ACTION NO. 11-7389 |
| EDWARD BASLEY, | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

**RUFE, J.** **NOVEMBER 7, 2013**

Before the Court is Edward Basley's Motion to Vacate, Set Aside or Correct a Sentence pursuant to 28 U.S.C. §2255. For the reasons discussed below, the motion will be denied.

### I. BACKGROUND

On December 7, 2005, a superseding indictment charged Defendant Edward Basley with two counts of distribution of cocaine (Counts Two and Four), possession with intent to distribute cocaine base (Count Five), possession with intent to distribute cocaine (Count Six), possession of a firearm in furtherance of a drug trafficking crime (Count Seven), and two counts of being a felon in possession of a firearm (Counts Eight and Twenty). Basley pleaded not guilty, and was tried by jury before this Court from February 12 through February 20, 2007.

The evidence at trial consisted primarily of the testimony of a confidential informant ("CI"); testimony of police officers and drug enforcement agents with whom CI cooperated; recorded conversations between CI and Basley; and physical evidence recovered from a house at 5343 Darrah Street in Philadelphia. CI's cooperation began in September 2004, when police executed a search warrant at his house and discovered drugs and weapons there. CI told law enforcement officials that Basley had provided him with drugs (this information led to Count

Two). CI also told the police that he owed Basley a drug debt of $6,250 and that he owed Robert Wright, a codefendant, $11,000, also for drugs.

Law enforcement secured the cooperation of CI by agreeing that a Drug Enforcement Agency ("DEA") task force would provide him with funds to present to Basley and Wright in apparent repayment of his debts if he assisted their investigation of Wright and Basley, in part by wearing a wire to his meetings with Wright and Basley and by allowing law enforcement to listen to his phone conversations. CI consented to this arrangement and agreed to cooperate fully with the government's investigation and prosecution of Basley and Wright.[1] On May 2, 2005, Basley fronted CI $3,000 worth of cocaine; CI wore a wire to record his conversations with Basley when repaying him. This fronting of the cocaine was charged in Count Four.

Much of the physical evidence in this case was uncovered on July 8, 2005. On that date, Basley called CI, who was in in a car with a police officer detailed to a DEA Task Force, and CI put the phone on speaker. Basley said he had cocaine to sell. A meeting was arranged, and Basley showed CI five kilograms of cocaine. CI reported this to law enforcement officials, who set up surveillance over the Darrah Street house, where Basley had previously been seen. During the surveillance, Basley, carrying a black duffle bag in one hand, used a key to gain entry to the house. Over the next two hours, four people knocked at the door and were admitted to the house. After Basley left the house, several officers executed a search warrant on the premises.

The Darrah Street house has three floors: a basement, a one-room main floor, and a second floor with two bedrooms. On the ground floor, officers found several items that demonstrated Basley's close connection to the house, including "(1) a photograph of Basley and Wright, (2) a letter addressed to Basley with tally work on the back, (3) a receipt with Basley's

[1] Hr'g Tr. 167:25–168:22; 170:13–17 (Feb. 13, 2007).

name on it, (4) an envelope addressed to Basley, (5) a personal card addressed to Basley, (6) an auto-insurance policy for Basley addressed to 5343 Darrah Street, and (7) an envelope from the Pennsylvania Department of Transportation addressed to Edward Basley."[2] The search was videotaped, and there was a young girl in the house at the time of the search who appears on the tape.

Police also found drug paraphernalia on the ground floor, including baking powder, digital scales with drug residue, and two bags of crack cocaine (this formed the basis of Count Five). Also on the ground floor was a 9mm Beretta handgun, loaded and with one round in the chamber, stored underneath a baby's clothes in a basket on the floor (the Beretta formed part of the basis for Counts Seven and Eight). In the basement, police found Basley's black duffle bag, containing about 1.6 kilograms of cocaine (this contraband was charged in Count Six).

Upstairs in the front bedroom, police found further evidence linking Basley to the Darrah Street house, including: "(1) a Pennsylvania identification card with Basley's name and address on it, (2) two men's watches, (3) a chain with a large diamond-encrusted 'B' on it, (4) a Comcast bill for 5343 Darrah Street in Basley's name, (5) a Visa card in Basley's name, (6) Basley's social security card, (7) an application for a Visa card in Basley's name, (8) a letter regarding a Mastercard addressed to Basley at Clapier Street [a different house that may have been Basley's primary residence], and (9) a handwritten note addressed to 'B.'"[3] Inside the dresser in that bedroom, police found a Glock pistol, loaded with a round chambered (the Glock is the rest of the basis for Counts Seven and Eight). Basley was arrested on November 7, 2005, while driving his car. A search of the car disclosed a loaded Taurus pistol, forming the basis for Count Twenty.

[2] *United States v. Basley*, 357 F. App'x 455, 457–58 (3d Cir. 2009).

[3] *Id.* at 458.

After a week of testimony and argument, the jury acquitted Basley of Count Two and convicted him on all other counts by a special verdict. He appealed to the Third Circuit which affirmed, except that it held that there was insufficient evidence for a reasonable juror to reach the conclusion that this jury did on its verdict form that Basley possessed the Beretta. Nevertheless, because the evidence supported his possession of the Glock as a felon and in furtherance of a drug trafficking crime, the Third Circuit affirmed his conviction on Counts Seven and Eight[4] and affirmed the conviction and sentence in all other respects.

## II. DISCUSSION

Basley raises four claims. He argues first, his counsel on direct appeal was ineffective in failing to appeal the trial court's decision to overrule Defendant's timely objection to a statement made in the prosecution's closing argument; second, the United States District Court was without jurisdiction to issue the warrant to search the Darrah Street house; third, a prior conviction was wrongly used to enhance Defendant's sentence; and fourth, he should not have been sentenced to five years of incarceration pursuant to 18 U.S.C. § 924(c) consecutively to the rest of his sentence.

Basley's arguments may be reviewed on the merits. Claims of ineffective assistance of trial and appellate counsel are properly raised in a § 2255 motion.[5] And although Basley's other claims were not pressed on direct appeal, the Government has not raised the affirmative defense

---

[4] *Id.* at 461–62.

[5] *Massaro v. United States*, 538 U.S. 500, 504 (2003) ("[A]n ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal.").

of procedural default. In the absence of briefing on this issue, the Court declines to rule on it *sua sponte*.[6]

*Ineffective Assistance of Appellate Counsel*[7]

The Sixth Amendment guarantees to each criminal defendant the effective assistance of counsel. Whether counsel was ineffective is evaluated under the familiar guidelines of *Strickland v. Washington*. To prevail on an ineffective assistance of counsel claim:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.[8]

[6] Unlike petitions for writs of habeas corpus under 28 U.S.C. § 2254, no statutory exhaustion requirement applies to a Motion to Vacate, Set Aside, or Correct a sentence under § 2255. Courts have, however, created a procedural default doctrine which in the § 2255 context operates in much the same way as exhaustion (not procedural default) under § 2254. This difference in terminology is confusing; it stems from the fact that a § 2255 motion is not a petition for a writ of habeas corpus, which generally requires—of both federal and state prisoners—exhaustion or at least the unavailability of other remedies. 28 U.S.C. § 2255(e) ("An application for a writ of habeas corpus in behalf of a prisoner who is authorized to apply for relief by motion pursuant to this section, shall not be entertained if it appears that the applicant has failed to apply for relief, by motion, to the court which sentenced him, or that such court has denied him relief, unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention."); *United States v. Hayman*, 342 U.S. 205, 223 n.40 (1952) ("If Section 2255 had not expressly required that the extraordinary remedy of habeas corpus be withheld pending resort to established procedures providing the same relief, the same result would have followed under our decisions."); *U.S. ex rel. Norris v. Swope*, 72 S. Ct. 1020, 1021 (1952) (Douglas, J., in chambers) (declining to entertain on the merits a habeas petition pursuant to 28 U.S.C. § 2241 absent exhaustion of other remedies available to defendant to attack his sentence collaterally).

The case law is clear that a failure to raise a claim on appeal from a federal criminal trial is a procedural default, not a failure to exhaust. Randy Hertz and James S. Liebman, Federal Habeas Corpus Practice and Procedure § 41.4 & nn. 5–6. One difference between exhaustion under § 2254 and procedural default under § 2255 is that § 2254(b)(3) explicitly states that the exhaustion requirement can only be waived expressly, while the judicially created procedural default bar can be waived in § 2255 proceedings by the Government's failure to assert the argument. *Oelsner v. United States*, 60 F. App'x 412, 414 (3d Cir. 2003) ("The Supreme Court has determined that 'procedural default is an affirmative defense for' the government. *Gray v. Netherland*, 518 U.S. 152, 165–66 (1996). Where the government fails to raise an affirmative defense in a timely manner, it 'lose[s] the right to assert the defense thereafter.'" *Id.* at 166."). Here, the Government has not raised the defense in response to Basley's motion.

[7] Basley's Motion was filed *pro se*, but his reply to the Government's Response was counseled and focused only on the ineffective assistance claim.

[8] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

In this case, Defendant argues that counsel failed to appeal the trial court's adverse ruling on defense counsel's objection at trial that the prosecutor's closing argument was unduly prejudicial. The validity of the objection is relevant to Defendant's *Strickland* claim because it is not ineffective to decline to appeal a meritless issue.[9]

A prosecutor may not make comments in closing argument that "'so infect[] the trial with unfairness as to make the resulting conviction a denial of due process.'"[10] It is not enough for defendant to show that the comments are "undesirable or even universally condemned."[11] Courts review closing arguments in the context of the whole record to determine whether a defendant's trial was fair.[12]

In her closing argument, the Assistant United States Attorney argued to the jury that the Beretta found in a basket of baby clothes on the ground floor of the Darrah Street house both belonged to Basley and was used in furtherance of a drug crime. Her argument that it belonged to Basley centered on the substantial evidence in the case that Basley lived at the house. Her argument that the gun was used in furtherance of a drug crime was based in part on the ample

---

[9] *Sistrunk v. Vaughn*, 96 F.3d 666, 670 (3d Cir. 1996) ("Appealing losing issues 'runs the risk of burying good arguments . . . in a verbal mound made up of strong and weak contentions.'") (quoting *Jones v. Barnes*, 463 U.S. 745, 753 (1983)). Additionally, "a failure to sustain an objection to a prosecutor's closing argument is typically reviewed for abuse of discretion." *United States v. Moore*, 375 F.3d 259, 263 (3d Cir. 2004). It is less likely that a court of appeals will disturb a ruling that it reviews for abuse of discretion than one that it reviews *de novo*, all else equal. There may be cases where an abuse of discretion is so obvious and egregious that any effective lawyer would appeal the abusive ruling, but appellate lawyers need to pick their battles, and it is a reasonable strategy not to appeal issues unlikely to result in reversal.

[10] *Darden v. Wainwright*, 477 U.S. 168, 179-81 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)).

[11] *Id.*.

[12] *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001) ("Supreme Court precedent counsels that the reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant.")

evidence that drug activity occurred at the house and that Basley was a key participant in that activity.

The AUSA also countered the suggestion that defense counsel had made during the cross examination of Agent Cohen, one of the officials who searched the house, that the gun may have been used for home protection purposes. She argued that because the gun was stored with the magazine loaded and a bullet in the chamber (meaning that all one had to do to fire the gun was pull the trigger) and kept in a public area of the house where an eight-year-old had access to it, the gun was not used for home protection purposes. She argued that the way the gun was stored actually endangered rather than protected the inhabitants of the house.

The jury convicted defendant of one count of violating 18 U.S.C. § 924. Defendant argues that the prosecution's reference in her closing statement to the children's safety inflamed the passions of the jury and caused them to convict the defendant of using a gun in furtherance of a drug crime. In support of this argument Defendant points to the Third Circuit's holding on direct appeal that there was insufficient evidence to find beyond a reasonable doubt that Basley possessed the Beretta.

There are two basic problems with Defendant's argument. First, the prosecutor's statement was proper argument based on facts in evidence and based on defense counsel's strategy in cross-examination. Second, even if the reference to the children was improper, it did not so infect Basley's trial as to deny him due process.

The comments to which Basley objects are set out below, with additional statements provided for context:

> "This [a piece of mail] is one item addressed to Syreeta. That's important, because inside, the officer showed you the—the insurance card, and who's it for? S. Custas, Syreeta Custas, the woman in the video [of the search] and N. Basley and L.—and L. Basley, the two kids. It's his woman, his kids, his mail, his jewelry, his credit

cards, his personal items in that house with his guns, his coke, and his crack. It's all his. . . .

"The guns, he is charged with—for the guns with possession of a firearm in furtherance of a drug trafficking offessnse. The significant question for you will be the guns in the house, well, did he possess them? We just talked about that. It's his drugs, his guns, his mail, his kids, his woman. I say that just because I don't know wife, girlfriend, but his significant other. It's his stuff. He's got the key.

"Now the gun, his guns, and we know it's his Glock, because he talks about his Glock in the stash, but the question is did he possess those the way many Americans lawfully possess guns in their homes, or did he possess it in furtherance of a drug trafficking offense. The evidence clearly shows he possessed it in possession [sic] of drug trafficking offense.

"The gun—first of all, the Beretta downstairs, it's in a basket with baby clothes, I think. It's right next to the stroller. Can you show those pictures?

"Do you remember Agent Cohen told you drug traffickers keep firearms because drugs are expensive. Those five kilos of cocaine that Basley had in that black gym back [sic], at 21,000 a kilo, a low price, that's more than $100,000 worth of drugs. That's well worth being robbed over. If somebody will rob you for a couple bucks out of your purse, do you think they'd rob you for $100,000 worth of cocaine?

"So Agent Cohen told you that drug dealers keep guns to protect their stash. He also told you that drug dealers keep guns to protect their money. When Basley gets some money coming back from that, he's going to have more than a hundred grand in cash. He told you that drug dealers get robbed.

"And then what about the location of that? Do you remember, the officer who found that gun told you that from where that gun—you know, there is the gun and next to it is the stroller. You can see the wheel in the picture, and in one of the photos, you can see the edge of the chair, and the officer told you that from where that gun was, you had a clear shot to the door. Somebody coming in to steal your drugs, to steal your money, to steal your jewelry that you paid for with the proceeds of your drugs, you could—you could use that gun to protect your drugs, your gun—or excuse me—your drugs, your money, your—your jewelry, your stuff.

"Now, defense counsel tried to make the point well, it's a small house and people lawfully own guns. That gun is not to protect the occupants of the house, and you know that, because in that video, you saw an 8-year old running around the house. How many parents wishing to protect their children leave a fully loaded semi-automatic weapon in the basket with one in the chamber and an 8-year-old running around the house?

"This is not to protect the 8-year-old. This is to protect the drugs, the money, the proceeds is what it's for. So that is possession in furtherance of.

"Upstairs, the Glock, the Glock is the same thing, fully loaded, one in the chamber, ready to go, in the drawer that his jewelry is sitting on top of. He is—he is protecting not his kids who could find this gun and kill themselves. He is protecting his stash. He is protecting his proceeds."[13]

[13] Hr'g Tr. 49:17–51:21, Feb. 20, 2007.

Throughout her argument, the Assistant United States Attorney tried to convince the jury that the guns found in the Darrah Street house were possessed in furtherance of a drug crime. In order to persuade the jury, the prosecutor needed to respond to the suggestion that defense counsel elicited from Agent Cohen on cross-examination that the gun might have been used to defend the home, its occupants, and property within the home.[14] In making her closing statement, the prosecutor did not dwell at length on the vulnerability of the children at Darrah Street. Instead, she made the commonsense point that a person concerned about home defense would probably not endanger children, who are less likely than adults to handle firearms responsibly, by keeping loaded weapons ready to fire and within reach of the children.

The Assistant United States Attorney pointed to the locations of the guns within the house and asked the jury to infer that because the guns were dangerous to the occupants, they were not likely in the house to protect the occupants; rather their situation was more consistent with use in furtherance of a drug crime. The prosecutor's comments, if emphatic, were nonetheless logical, based on facts in evidence, and could not reasonably be seen as targeted to inflame the jury's passions.

Comparison with statements in the cases Defendant relies upon where courts found remarks to be improperly inflammatory is instructive. For example, the court in *Marshall v. Hendricks* held that it was improper in summation for the prosecutor to vouch for his crucial

---

[14] "Q . . . It could be to protect—for self defense. It could be if somebody comes in to rob you. Notwithstanding the drug operation. Or if somebody comes in to do you harm, correct?

"A Yes, that's correct. . . . And if someone's trying to break into the home, which I have investigated numerous similar type cases, a firearm would be available to be utilized for either the protection of the occupants in the home or any legal or illegal items that are contained in that home.

"So I can't rule it out and say absolutely yes or absolutely no. But I have encountered situations where a firearm was used for that very purpose." Hr'g Tr. 170:10–171:9.

witness;[15] to make arguments that ran directly contrary to the evidence in the case;[16] to deliver inflammatory statements that threatened to divert the jury's attention from the evidence;[17] and to emphasize the virtue of the victim in arguing that a death sentence was appropriate.[18] The comments in *Marshall* were *ad hominem* attacks that did not relate to or misstated the evidence in the case. The statements in *Newton*,[19] *McClean*,[20] *Drake*,[21] *Lesko*,[22] and *Moore*[23] similarly

[15] "Ladies and gentlemen of the jury, in order to save himself, Billy Wayne McKinnon had to tell the truth. That was the deal. Because when he gave that statement, we checked it out up and down and sideways, and if we caught him in one lie—and you heard the testimony. He waived immunity. Everything he said could be held against him. If we caught him in one lie, then he would be facing a murder charge." *Marshall v. Hendricks*, 307 F.3d 36, 65 (3d Cir. 2002).

[16] "The bulk of that insurance was taken out in twelve-month period before Maria Marshall's death. I don't care if it's accidental; I don't care if it pertains to getting killed in a car on a Thursday only. That insurance was in effect, and he has the audacity to get up here and talk about contestability clauses, to give you the impression that he's not going to get any of that money. He's already received six hundred thousand dollars, and I can guarantee you, ladies and gentlemen, if you acquit this defendant, the checks will be in the mail within a week. Make no mistake about it." *Id.*.

[17] "And he has the audacity to bring in his three boys to testify. That's obscene. And I'm not being critical of them, because I would probably do the same thing. To put his boys on that witness stand is obscene, and for that there's a place in hell for him. He will use anybody, he will say anything and he will do anything, including his own family, to get out from under. And that's Robert Oakley Marshall. Make no mistake about it." *Id.* at 65–66.

[18] "I didn't know Maria Marshall, but I know and you know that she loved her boys. I know and you know that she loved her husband. For eight months that lady knew that his afternoons were spent in the arms of another woman. She continued to cook for him, she continued to clean his clothes, she continued to keep the house clean, she continued to make love with him, because she loved him. She wanted to start all over. She wanted to give him a second chance. She had a right to live her life in full, to watch her boys continue to grow, to watch them graduate from school, to get married and have families of their own, but he tossed it all away because of his desperation and his greed. And that is Robert Oakley Marshall." *Id.* at 66.

[19] "I ask you in determining the credibility of the defendant, close your eyes, ask yourselves would you let him anywhere near your children?" *United States v. Newton*, 369 F.3d 659, 681 (2d Cir. 2004).

[20] "The Government would submit to you that based upon the testimony of the witnesses, there is something unique and distinctive about crack cocaine. And we speak here today not only on behalf of the Government of the United States and it's [sic] people but also upon the people, on behalf of the people who have no voice. Those are the crack addicted babies languishing in hospitals around the country." *United States v. McLean*, 138 F.3d 1398, 1405 (11th Cir. 1998).

[21] "It may be a sign of a tender heart [to spare defendant the death penalty], but it is also a sign of one not under proper regulation. Society demands that crime shall be punished, and criminals warned, and the false humanity that starts and shudders when the axe of justice is ready to strike is a dangerous element for the peace of society." *Drake v. Kemp*, 762 F.2d 1449, 1458 (11th Cir. 1985).

[22] "And I want you to consider that. John Lesko took the witness stand, and you've got to consider his arrogance. He told you how rough it was, how he lived in hell, and he didn't even have the common decency to say I'm sorry for what I did. I don't want you to put me to death, but I'm not even going to say that I'm sorry. . . . So I'll say this: Show them sympathy. If you feel that way, be sympathetic. Exhibit the same sympathy that was exhibited

invited the jury to abandon reason in favor of passion. By contrast, the prosecutor's comments here were highly relevant to the issues facing the jury and based on evidence that the jury was to consider.

In *Newton*, *McLean*, and *Marshall*, despite condemning the prosecutors' statements, the courts denied relief to the criminal defendant because the improper comments did not deprive the defendant of a fair trial. Similarly, the Supreme Court in *Darden v. Wainwright*[24]excoriated the prosecution for highly improper closing argument, but considered whether the comments, in the context of the trial as a whole, deprived the defendant of due process and concluded they did not.[25] The Third Circuit instructs courts to "examine the prosecutor's offensive actions in context

---

by these men on January 3rd, 1980. No more. No more. I want you to remember this: We have a death penalty for a reason. Right now, the score is John Lesko and Michael Travaglia two, society nothing. When will it stop? When is it going to stop? Who is going to make it stop? That's your duty." *Lesko v. Lehman*, 925 F.2d 1527, 1540–41 (3d Cir. 1991).

[23] In *Moore*, the prosecutor argued that the defendant, a black man, "selected a white woman to rape because his wife is white." *Moore v. Morton*, 255 F.3d 95, 108 (3d Cir. 2001). He also argued that after his wife gave birth and suffered from mastitis, "right in the middle of the time after the birth of the child and the disability of the wife, I ask you to infer that that is a period of time when this individual would have his greatest need for sexual release" because, "I mean, she has bleeding breasts." *Id.* at 100–101. Lastly, the government relied heavily in that case on hypnotically reconstructed identification of the assailant by the victim, and in arguing to the jury that the identification was credible, the prosecutor stated, "The last thing I have to say is that if you don't believe [the victim] and you think she's lying, then you've probably perpetrated a worse assault on her." *Id.* 101. These statements of course cross not only the bounds of professional responsibility and permissible argument but also basic decency. While statements could be less inflammatory than the *Moore* closing arguments and still result in a due process violation, the statements in Basley's criminal trial are so dramatically milder than these that *Moore* can hardly be seen as an analogous precedent.

[24] 477 U.S. 168 (1986).

[25] The prosecutor in *Darden* argued, "He shouldn't be out of his cell unless he has a leash on him and a prison guard at the other end of that leash. I wish [the victim] had had a shotgun in his hand when he walked in the back door and blown his [Darden's] face off. I wish that I could see him sitting here with no face, blown away by a shotgun. I wish someone had walked in the back door and blown his head off at that point. He fired in the boy's back, number five, saving one [bullet]. Didn't get a chance to use it. I wish he had used it on himself. I wish he had been killed in the accident, but he wasn't. Again, we are unlucky that time. [D]on't forget what he has done according to those witnesses, to make every attempt to change his appearance from September the 8th, 1973. The hair, the goatee, even the moustache and the weight. The only thing he hasn't done that I know of is cut his throat." 477 U.S. at 181 n.12 (citations and internal quotation marks omitted).

and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant."[26]

Here, in addition to the fact that the Court does not consider the Assistant United States Attorney's closing argument to be improper (and therefore "the severity of the conduct" is as low as can be), the Court must hold that in light of the trial as a whole, the comments could not have denied Defendant of due process. Basley received a week-long trial with able representation by his defense attorney. His lawyer vigorously cross examined several witnesses, eliciting testimony from Agent Cohen that the guns were conceivably used for home protection, and suggesting that CI might have a motive to fabricate his testimony in order to receive a favorable sentencing recommendation. The jury did not accept these arguments, but they were made competently. The jury unanimously acquitted Basley of Count Two, strongly suggesting they were not unfairly prejudiced against him and performed their duty to weigh evidence with respect to each count.

The Court bookended the trial with instructions that closing arguments are not evidence and cannot be considered by the jury as such.[27] The Court presumes that jurors follow instructions, and Defendant has not suggested to the contrary. And finally, the evidence in this case was overwhelming. A confidential informant testified at length about Basley's drug activities, testimony that was corroborated in every respect by testimony from other witnesses, audio recordings of the informant's conversations with Basley, and physical evidence. Police Searched the Darrah Street house, with which Basley was closely connected, and found large quantities of drugs and drug paraphernalia that are the hallmarks of drug distribution.

---

[26] *Moore*, 255 F.3d at 107.

[27] Hr'g Tr. 122:20–25 (Feb. 12, 2007) ("After all of the evidence is in the attorneys will present their closing arguments to you, and they will summarize and interpret the evidence for you as to how they would like you to consider the evidence. Again, the arguments are not evidence, and the Court will later instruct you on the law that you must apply to this case."). Hr'g Tr. 119:2–5 (Feb. 20, 2007) ("Questions, objections, statements, and arguments of counsel are not evidence in this case unless, of course, they were made as a stipulation of fact.").

Considering the mildness of the prosecutor's statements in closing, the statements' necessity to rebut defense theories developed via cross-examination, the fairness of the trial as a whole, the Court's instructions to the jury, and the evidence against Basley, the Court must hold that the prosecutor's comments did not deprive Defendant of due process of law. Because Defendant could not have prevailed on an appeal of the Court's decision to overrule defense counsel's objection to the closing argument, his appellate counsel was not ineffective in failing to raise this issue.

B. *Jurisdiction of Court to Issue Search Warrant*

Defendant next contends that because he was not under indictment at the time a search warrant was executed, "the United States Magistrate/District Court Judge was without jurisdiction to issue a search warrant to federal agents to search the property of 5343 Darrah Street located in the confines of the State of Pennsylvania and City of Philadelphia."[28] The Government correctly responds that the search warrant was issued by Pennsylvania Commonwealth authorities, so the spurious argument about Federal courts' jurisdiction to issue warrants is irrelevant.[29]

C. *Enhancements for Prior Sentences Under Sentencing Guidelines*

The parties next dispute whether Defendant's criminal history score was properly calculated under U.S.S.G. § 4A1.1. That statute states in relevant part:

> (a) Add 3 points for each prior sentence of imprisonment exceeding one year and one month.

[28] Doc. No. 574-1, at 10.

[29] *See* Doc. No. 257-1 (search warrant). Moreover, The Supreme Court has referred uncritically to the power of federal courts to supervise grand juries (which are convened before defendants are under indictment) and to issue search warrants twice in watershed opinions about the scope of Article III. *Mistretta v. United States*, 488 U.S. 361, 389 n.16 (1989); *Morrison v. Olson*, 487 U.S. 654, 681 & n.20 (1988). This Court does not believe that the Supreme Court made those statements casually; the power to issue search warrants is within federal courts' Article III jurisdiction, even pre-indictment.

> (b) Add 2 points for each prior sentence of imprisonment of at least sixty days not counted in (a).
> (c) Add 1 point for each prior sentence not counted in (a) or (b), up to a total of 4 points for this subsection.

The term "prior sentence of imprisonment" is defined in U.S.S.G. § 4A1.2(b)(1) as "a sentence of incarceration." "Incarceration" is not defined, but the commentary to 4A1.2 states, "To qualify as a sentence of imprisonment, the defendant must have actually served a period of imprisonment of such sentence (or, if the defendant escaped, would have served time)."[30] The term "prior sentence," on the other hand, is defined in U.S.S.G. § 4A1.2(a)(1) as "any sentence previously imposed upon adjudication of guilt . . . for conduct not part of the instant offense."

Prior to his conviction in this Court, Basley was convicted in state court of two felonies for which he was sentenced "to 9 to 23 months incarceration, with immediate parole to house arrest with electronic monitoring, followed by two years probation, all to be served concurrently."[31] The parties disagree whether, when Defendant was sentenced to terms of imprisonment and immediately paroled, his sentences were "prior sentences of imprisonment," earning him points under 4A1.1(a) and (b) or merely "prior sentences" within the meaning of 4A1.1(c).

The Court need not resolve this question, however, because Basley was sentenced to a statutory mandatory minimum term of 300 months that the guidelines do not alter. Regardless of which Guidelines section his prior sentence corresponds to, he had been convicted of a felony (possession with intent to deliver a controlled substance, 35 Pa. C.S.A. § 780-113(a)(30)) before his conviction in this Court. Under 21 U.S.C. § 841(b)(1), given the amounts of drugs in this case and the fact of his prior conviction, Basley faced a mandatory minimum sentence of 20 years

[30] Application Notes n.2.

[31] Response to 2255 Motion, Doc. No. 597, at 30–31. Defendant does not dispute this characterization of his prior sentence.

(240 months). He was also convicted of violating 18 U.S.C. § 924(c)(1)(A), which carries a mandatory minimum of five years (60 months), such time to be served consecutively to any other sentence imposed.[32] His total mandatory minimum sentence was thus the 300 months he received.

D. *Conviction and Sentence Under 18 U.S.C. § 924(c)(1)(A)*

Defendant next argues that he should not have been convicted of violating 18 U.S.C. § 924(c)(1)(A), possession of a firearm in furtherance of a drug trafficking crime and sentenced to a mandatory consecutive term of five years' imprisonment. He argues that the statute's "use of the word conviction rather than wording describing the offense suggests an intent to reach recidivists."[33] Construing this claim liberally, it appears that Basley is arguing that he should not have been convicted separately of a drug crime (violation of 21 U.S.C. § 841(b)(1)) and of using a firearm in furtherance of the same drug crime and sentenced for the two crimes consecutively. However, this argument contradicts the language of the statute, which explicitly contemplates the situation Basley faces, providing that "no term of imprisonment imposed on a person under this subsection shall run concurrently with any other term of imprisonment imposed on the person, *including any term of imprisonment imposed for the crime of violence or drug trafficking crime during which the firearm was used, carried, or possessed*."[34] There is therefore no merit to Basley's argument.

## III. CONCLUSION

[32] 18 U.S.C. § 924(c)(1)(D)(ii).

[33] Doc. No. 590 at 6.

[34] 18 U.S.C. § 924 (emphasis added).

For the foregoing reasons, the § 2255 Motion is denied. Because the record as a whole conclusively shows that Basley is not entitled to relief, there will be no hearing.[35] And because Basley has made no substantial showing that reasonable jurists could debate whether this Motion should be resolved differently, no certificate of appealability shall issue.[36] An appropriate Order follows.

[35] *United States v. Dawson*, 857 F.2d 923, 927 (3d Cir. 1988).

[36] *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).